SMITH v. FERRIES & C. H. RY. CO. et al.*

No. 15,962; December 28, 1897.

51 Pac. 710.

**Appeal—Divided Court.**—Where One Justice of the supreme
court is disqualified, and the six remaining are equally divided in
opinion, the judgment will be affirmed.

**Corporation—Purchase of Railway.**—A Stockholder of a corpo-
ration, which purchased a street railroad of another corporation and
agreed to assume bonds issued by it, cannot raise the question of
fraud in constructing the road, or attack the validity of the bonds.

**Corporation—Stockholder's Suit—Parties.**—Where a Corpora-
tion Purchased all the property of another corporation, including a
street railway, and all the property it might acquire, and all its rights,
except its right to be a corporation, and assumed certain bonds that
it had issued, the latter corporation is a necessary party defendant,
where a stockholder of the former attacks the validity of the bonds,
and charges that the railway was fraudulently constructed.

**Corporation—Assumption of Bonds.**—It is not Ultra Vires for
a corporation to assume the payment of bonds that were issued by

---

*Rehearing denied.

another corporation in violation of Civil Code, section 309, prohibiting the contraction of debts beyond the subscribed capital stock.

**Corporation—Limitation on Indebtedness. — A Corporation Which, in Payment for property,** assumes the payment of bonds issued by another corporation, cannot retain the property, and claim the bonds were invalid, as being overissued, in violation of Civil Code, section 309, prohibiting the contraction of debts beyond the subscribed capital stock.

**Corporation—Original Bonded Indebtedness.—Prior to the Statute** of 1889, directors of a corporation had power to create an original bonded indebtedness.

**Corporation—Bonds—Notice of Meeting.—A** stockholder claiming that bonds issued by the directors were void, because issued without notice to the stockholders, must allege that the stockholders did not consent to the meeting at which the indebtedness was created, as Civil Code, section 317, provides that such consent abrogates the necessity of notice.

**Corporation—Limitation on Indebtedness.—Bonds of a Corporation** issued in violation of Civil Code, section 309, prohibiting the contraction of debts beyond the subscribed capital stock, are not void.

**Corporation—Bonds.—The Decision of the Supreme Court that** bonds of a corporation, issued in violation of Civil Code, section 309, are not void, is a declaration of a rule of property, and will not be overruled.

**Corporation—Limitation on Indebtedness.—Shares of Stock Delivered** by a corporation to the stockholders of another corporation, as a part of the price of property purchased from it, are part of the former corporation's capital stock, within Civil Code, section 309, prohibiting the creation of debts by a corporation beyond its "subscribed capital stock."[1]

**Corporation—Fictitious Stock.—Complainant Alleged That a** corporation purchased property of another corporation worth at least $1,200,000, and as the price assumed an indebtedness of $1,050,000, and issued to the latter corporation's stockholders twenty-four thousand seven hundred and fifty shares of stock, of the par value of $2,475,000. He did not allege that the former corporation had any property before such purchase. Held, that there was no fictitious issue of stock, within constitution, article 12, section 11, providing that all "fictitious" issues of stock shall be void.[2]

---

[1] Cited in Smith v. Martin, 135 Cal. 250, 67 Pac. 780, as a valuable element in the history of that case by reason of the published opinions, although, having gone off on an equal division of the court, it is without authority as precedent.

[2] Cited and approved in Turner v. Markham, 155 Cal. 571, 102 Pac. 275, where, speaking of a corporation owning no property, (wherefore its stock was without value), the court says: "It was

Corporation.—A Dissatisfied Stockholder Alleged That the Directors, in pursuance of a fraudulent scheme, had created a bonded indebtedness in excess of the capital stock, and had purchased certain property of another corporation, of which they were also directors, and in payment therefor had issued stock to its stockholders, and had assumed the payment of illegal bonds. Held, he was entitled to no relief that could not be granted to the corporation itself.

Corporation.—A Stockholder Alleged That the Directors Purchased property of another corporation worth at least $1,200,000, and in payment therefor issued shares of stock of the par value of $2,475,000, and assumed an indebtedness of $1,050,000. He did not allege that the corporation owned any property before such purchase. Held, he did not show that he was injured.

Corporation—Fictitious Stock.—Where Directors of a Corporation Purchased of another corporation, of which they were the stockholders, property of the value of $1,200,000, and in payment therefor issued to themselves 24,750 shares of stock, of the par value of $2,475,000, and assumed an indebtedness of $1,050,000, a stockholder of the former corporation is not entitled to have such issue of stock declared void and fictitious, without setting aside the whole transaction.

Corporation—Overissue of Bonds.—Where a Stockholder of a corporation alleges that its bonds were invalid, as being an overissue, it will be presumed the bonds are in the hands of bona fide holders, in the absence of allegations to the contrary.

Corporation.—Bonds.—The Allegation of a Stockholder, Assailing the issue of bonds by the directors, "that six per cent bonds, legally issued and properly secured, were worth much more than the

perfectly legal and proper for all the parties in interest in such a corporation to do as here they agreed to do—sell all or any part of the stock of the corporation in return for mining claims, or for anything else of value."

Cited, with other cases, in Garretson v. Pacific Crude Oil Co., 146 Cal. 188, 79 Pac. 840, in support of the proposition: "Acting in good faith, it was competent for all the stockholders to agree by unanimous concurrence that shares of the corporation should be issued to themselves in exchange for property conveyed by them to the corporation and to acquire which the corporation was formed."

Cited with approval by Ross, J., dissenting, in Holt v. California Development Co., 161 Fed. 15, 88 C. C. A. 167, where the sufficiency of the bill was being considered in an application by a stockholder to have a receiver appointed and contracts of the corporation annulled. Said the dissenting judge: "The appellant sued as a dissatisfied stockholder of the California Development Company, and as such only. Manifestly, then, he can have no other or greater right to maintain the suit than would that corporation, were it the complainant."

face value, to wit, fifteen per cent more in the market," is not an allegation that the six per cent bonds issued by the corporation were worth fifteen per cent premium.

**Corporation.—A Stockholder's Allegation That Certain Directors** furnished labor and material for the corporation, and charged large profits against it, "with the consent and connivance of" the other directors, is not sufficient to show liability of the latter directors.[1]

**Corporation.—An Allegation That a Corporation's Stockholder** "is informed and believes" that certain directors furnished labor and material for the corporation, and charged large profits against it, and that no accounting had been made, is insufficient on demurrer.

**Corporation.—A Purchase by a Corporation of All the Property of** Another corporation is not void merely because the boards of directors of both corporations were the same.

**Corporation—Stockholder's Suit.—A Transaction by Directors** that is voidable only will not be set aside at the instance of the stockholder, unless he shows that he sustained damage.

**Pleading—Sustaining Demurrer Without Leave to Amend.—A** complainant cannot, on appeal, first complain of error in sustaining a demurrer without leave to amend.

**Pleading—Amendment—Refusal.—It** is not an abuse of discretion to refuse leave to amend a fourth amended complaint.

APPEAL from Superior Court, City and County of San Francisco; Charles W. Slack, Judge.

Bill by J. Howard Smith against the Ferries and Cliff House Railway Company and others. Judgment for defendants and plaintiff appeals. Affirmed.

J. Howard Smith in pro. per.; E. F. Preston, Pillsbury & Hayne and Page, Eels & Wheeler for respondents.

PER CURIAM.—In this cause Justice Harrison is disqualified; and of the other members of the court Justices Garoutte, Van Fleet and McFarland are of the opinion that the judgment should be affirmed, and the Chief Justice and Justices Temple and Henshaw are of the opinion that the judgment should be reversed. The cause has been pending a long time, and repeated consultations have demonstrated that the said differences among the justices are permanent. For this reason, and upon the principle announced in Santa

---

[1] Mentioned in Copsey v. Sacramento Bank, 133 Cal. 662, 85 Am. St. Rep. 238, 66 Pac. 8, as citing many cases to the point that "it is well settled that a director may deal with his corporation."

Rosa City R. R. v. Central St. Ry. Co., 112 Cal. 436, 44 Pac. 733, Frankel v. Deidesheimer, 93 Cal. 73, 28 Pac. 794, and Luco v. De Toro, 88 Cal. 26, 11 L. R. A. 543, 25 Pac. 983, it is ordered by the court that the judgment herein appealed from be, and the same is hereby, affirmed.

The views of the several justices are expressed in the following opinions:

Opinion of affirmance by GAROUTTE, J.:

Plaintiff, as a dissatisfied stockholder of the Ferries and Cliff House Railway Company, a corporation, has brought this action against the corporation, Thomas Brown and J. R. Jarboe, who it is alleged are the trustees of the holders of the bonds of the corporation, and the five other gentlemen named as defendants, who are alleged to be the directors of the corporation defendant. A demurrer was sustained to the fourth amended complaint, and an appeal is brought to this court for the single purpose of testing the legal sufficiency of that pleading. The action is essentially one in equity, and the complaint by its allegations deals with the affairs and transactions of three corporations, namely, the defendant corporation, the Powell Street Railway Company and the Park and Cliff House Railway Company.

The Powell Street Railway Company was organized December 9, 1886, and the five defendants in this case, who are alleged to be the directors of the defendant corporation, organized that corporation, and constructed and equipped the road. As to the manner the stock of this corporation was manipulated and held the complaint alleges: "Defendants Martin, Ballard, Magee, Adams and Lynch subscribed in writing for barely a sufficient number of shares of the capital stock of each of said corporations as would entitle them, under the statute, to incorporate each of said companies, and no more. In the Powell Street Railway Company said defendants subscribed for forty shares each, and said subscription list was thereupon closed, and thereafter all of said defendants duly became stockholders in said corporation to the extent of forty shares each; and that, except the aggregate subscription of two hundred shares, of the par value of $20,000, made by said defendants, directors, no other shares of the capital stock of said corporation were ever subscribed for or paid for by any other person, association or corpora-

tion. Upon September 12, 1887, bonds of the Powell Street Railway Company to the amount of $700,000 were issued to Martin and Ballard, two of the directors, in payment of the construction of the road, and said bonds were secured by a deed of trust of the corporate property to defendants Brown and Jarboe.''

The Park and Cliff House Railway Company was organized October 13, 1887, by these same defendant directors, and the same allegations generally are found in the complaint with reference to this corporation as are stated regarding the Powell Street Railway Company, except that the amount of bonds issued by said corporation was $350,000, and it was further alleged: ''In Park and Cliff House Railway Company said defendants subscribed for twenty shares each, and said subscription list was thereupon closed, and thereafter all of said defendants duly became stockholders in said corporation to the extent of said twenty shares each; and that, except said aggregate subscription of one hundred shares of the par value of $10,000, made by said defendant directors, no other shares of the capital stock of said corporation were ever subscribed for or paid for by any other person, association, or corporation.''

At a subsequent date the defendant corporation was organized by the same five gentlemen, and the allegations pertaining thereto, in effect, are the same as those we have already stated pertaining to the other corporations. We also find this allegation: ''In Ferries and Cliff House Railway Company said defendant directors subscribed for fifty shares each, and said subscription list was thereupon closed, and thereafter all of said defendant directors duly became stockholders in said corporation to the extent of said fifty shares each; and that, except said aggregate subscription of two hundred and fifty shares, of the par value of $25,000, made by said defendant directors, no other shares of the capital stock of said corporation were ever subscribed for or paid for by any other person, association or corporation, and that the remainder of said capital stock of said corporation was never sold to or bought and paid for (either in whole or in part) by any other person, association or corporation; that the same remained, continued to be, and still is the property of said corporation.'' It is further alleged that the proposed capital stock of each of these aforesaid corporations was divided

as follows: Powell Street Railway Company, $2,000,000—
twenty thousand shares, of the par value of $100; Park and
Cliff House Railway Company, $500,000—five thousand
shares, par value $100; Ferries and Cliff House Railway
Company, $2,500,000—twenty-five thousand shares, par value
$100. We then have the following important allegation:
"That in pursuance of said fraudulent scheme defendants
Martin, Ballard, Adams, Magee and Lynch, with the consent
of said Jarboe and Brown and the stockholders of said corpo-
rations, on the thirtieth day of December, 1887, caused the
Powell Street Railway Company, and on the fifth day of
March, 1888, caused and procured said Park and Cliff House
Railway Company, for valuable considerations, and by good
and sufficient conveyances and assignments, to convey, assign,
transfer and set over to defendant Ferries and Cliff House
Railway Company all the property, real and personal, then
owned or that might subsequently be acquired by both or
either of said Powell Street Railway Company or Park and
Cliff House Railway Company, together with all rights, in-
terests and franchises, vested and contingent, of each or
either of said corporations (except their right to be and re-
main a corporation)." It further appears that the con-
sideration for this transfer was a guaranty and assumption
by defendant corporation of all the bonded indebtedness and
other liabilities outstanding against the vendor corporations,
and also the issuance by the defendant corporation of all its
unsubscribed capital stock, to wit, twenty-four thousand
seven hundred and fifty shares, to the stockholders of the said
two corporations, in certain proportions. It is further alleged
that upon February 13, 1889, the defendant corporation
created a bonded indebtedness of $650,000, and that a trust
deed of its property was given to Brown and Jarboe to secure
the bondholders. It is also alleged that the net earnings of
the defendant corporation have been $400,000, and that this
money has been expended in paying interest upon the bonded
indebtedness either created or assumed by the defendant cor-
poration. It is also alleged that such application of the
earnings was unauthorized in law, for the reason that all
of these bonds, with the exception of a very limited amount,
were in excess of the subscribed capital stock of the several
corporations and void.

Plaintiff, by his prayer for relief, asks the court, among other things: (1) To quiet the title of the defendant corporation to all the property received by the transfer from the Powell Street Railway Company and the Park and Cliff House Railway Company. (2) To declare that no portion of the capital stock of any one of said corporations was ever subscribed for, or lawfully issued, except as follows, to wit: Two hundred shares, of the par value of $20,000, in the Powell Street Railway Company; one hundred shares, of the par value of $10,000, ·in the Park and Cliff House Railway; two hundred and fifty shares, of the par value of $25,000, in the Ferries and Cliff House Railway Company. (3) To declare that the transfer to these five defendants, as stockholders of the first two corporations organized, of the twenty-four thousand seven hundred and fifty shares of the capital stock of the defendant corporation, is fraudulent, inoperative and void. (4) To declare that the agreement entered into on the twenty-ninth day of December, 1887, wherein the defendant corporation assumed certain liabilities and bonded indebtedness of the other two corporations, was at the time of said guaranty and indorsement an unlawful creation of bonded indebtedness by said defendant corporation, as being in excess of $20,000, the subscribed capital stock of the Powell Street Railway Company, and that agreement be declared void, in so far as it attempts to hold the defendant corporation to a greater liability thereon than the aforesaid sum of $20,000; and the same relief is asked as to the Park and Cliff House Railway Company as to its indebtedness over and above the sum of $5,000, the amount of its subscribed capital stock. (5) That it be declared that the $650,000 of the bonded indebtedness created by the defendant corporation be declared an unlawful increase of its bonded indebtedness, as being in excess of its subscribed capital stock, and also that said indebtedness was an increase of its liabilities without the consent of its stockholders first had and obtained. (6) That said defendant directors account for all moneys received in their capacity as directors of the defendant corporation.

The foregoing facts comprise a somewhat meager statement of the allegations of a very voluminous bill in equity, and other allegations thereof will be noticed as we meet them in the consideration of the various questions involved in this litigation.

Plaintiff charges fraud in the construction of the Powell Street and Park and Cliff House roads, and also alleges that the amount of bonds issued by these two corporations was in excess of their respective subscribed capital stock, and that such bonds were void to the extent of that excess. We fail to see how these matters are involved in the present litigation. The plaintiff never was a stockholder in either of these corporations, and we think it is none of his affairs as to the conduct and management of their business. He is not in a position to raise a question of fraud in the construction of the roads, or to attack the validity of the bonds, as having been issued without warrant of law. Again, neither of these corporations is made a party defendant, and without their presence the court will not investigate their acts and adjudicate upon their property rights. The only shadow of ground upon which he seems to rely to give him a status as a litigant in this regard is the fact that the defendant corporation assumed the payment of these bonds; and he now declares the bonds void as being an overissue, and, being void, the net profit of the defendant corporation should not be applied to the payment of interest accruing upon them. The position of plaintiff is untenable. As suggested, the proper parties are not before the court in order to litigate the validity of those bonds. Again, conceding the bonds unlawfully issued, for the reason stated, that fact does not nullify the assumption of their payment by the defendant corporation. There is no condition in the contract entered into between these corporations, either expressed in the writing, or to be inferred from the law, that the assumption or the guaranty of this indebtedness was only to be binding as against the defendant corporation in case the bonds were in all respects regularly and legally issued. Neither is it necessary that the bonds should be regularly and legally issued in order that the defendant might bind itself in law to pay them as they matured. It is no more true than that the performance of any contract merely ultra vires might not be guaranteed by a third party. It is the law of this state that a corporation, for a valuable consideration, may guarantee or assume the debt of another corporation: Low v. Railroad Co., 52 Cal. 53, 28 Am. Rep. 629. Again, the assumption of this liability was based upon valuable considerations passing from the other two cor-

57

porations to the defendant corporation, and while retaining those considerations (and it expressly seeks to retain them by this pleading) it has no right to say: "The liability is not a valid one against the corporations creating it, and therefore not valid against me, and I will not pay it." By reason of the foregoing views, we dismiss from further consideration any question as to the validity of the bonds which formed a part of the consideration for the transfer to the defendant corporation of the various properties, rights and franchises of the Powell Street Railway Company and the Park and Cliff House Railway Company, and also as to any question as to charges of fraud pertaining to the construction of the roads of these two aforesaid corporations.

As we have seen, the defendant corporation assumed the payment of $1,050,000 of bonded indebtedness at the time it entered into the contract with the other two corporations. Thereafter it created a bonded indebtedness of its own amounting to $650,000, and it is insisted that, as against it, such assumed indebtedness and its own individual indebtedness are both void, as being in excess of its subscribed capital stock, the allegations of the bill being that its subscribed capital stock is $25,000. It is further claimed that the $650,000 indebtedness is void as having been created without notice to the stockholders. The creation of the defendant corporation's bonded indebtedness is alleged to have taken place February 13, 1889, and at that time we find no law upon the statute books forbidding the directors from creating a bonded indebtedness. The law as it then stood prohibited the directors from increasing a bonded indebtedness, and required a meeting of the stockholders to be held upon due notice to accomplish that purpose. But the creation of an original bonded indebtedness appears to have been a matter within the will of the board of directors, as coming within their general powers as such officers; and it was only by the statute of 1889, which took effect after this indebtedness was created, that such power was taken from the board of directors and given to the stockholders. But there is another reason which proves the weakness of the pleading. It is for the plaintiff affirmatively to state the facts which necessarily show this issue of bonds to be void, and it is not necessary that stockholders should have been notified as prescribed by the law in order that a bonded indebtedness might be created

at such meeting. Section 317 of the Civil Code provides: "When all the stockholders or members of a corporation are present at any meeting, however called or notified, and sign a written consent thereto on the records of such meeting, the doings of such meeting are as valid as if had at a meeting legally called and noticed." Those conditions may have been present at this meeting, and it was for the pleader to allege that such was not the fact; for, if such were the fact, the failure to give legal notice was wholly immaterial.

Was the $650,000 issue of bonds void, as being in excess of the subscribed capital stock of the defendant corporation? Plaintiff's contention to this effect is maintained upon the ground that such issue was violative of section 309 of the Civil Code, wherein it is said the directors of corporations must not create debts beyond their subscribed capital stock. In the very recent case of Underhill v. Improvement Co., 93 Cal. 300, 28 Pac. 1094, this identical provision of section 309 was under consideration, and it was there held, upon what we believe to be sound and convincing reasons, that a violation of this provision of the law by the board of directors did not have the effect of rendering the indebtedness created by its act void. And, unless the statute plainly and unequivocally declared that such would be the penalty visited upon creditors dealing with the directors of the corporation under those conditions, we would be loth to so hold, even if the question were one of the first impression; for the exact outstanding indebtedness of a corporation is often little less difficult to ascertain than that of a private individual. But, in addition to these considerations, the decision in that case has declared a rule of property, bonds have been bought and sold upon the faith of it, the business world has dealt and contracted in reliance upon the law as there declared, and for these reasons alone the interpretation of that provision of the statute as there given must stand until the legislature sees fit to otherwise enact.

The views we have heretofore expressed would seem to fully dispose of plaintiff's claim of the invalidity of the defendant corporation's bonds; but, owing to other questions arising in the case, and the bearings which the status of these bonds has in the consideration of those matters, we will further pursue our investigation as to the validity of this $650,000 issue of bonds. Section 309 of the Civil Code declares the

directors must create no debts beyond their subscribed capital stock. Let us assume the showing to be true that the bonded indebtedness of the defendant corporation, including this issue of bonds, was $1,700,000; did such indebtedness exceed the subscribed capital stock of the defendant corporation? Under these conditions the important question directly presents itself: What is meant by the term "subscribed capital stock," as used in the statute? The allegation of the bill is that the subscribed capital stock of the defendant corporation was $25,000. At the date of the issue of the defendant corporation's bonded indebtedness of $650,000 the corporation was then indebted in the sum of $1,050,000 of assumed indebtedness, and the status of its stock was as follows: Two hundred and fifty shares, of the value of $25,000, had been originally subscribed, and, of course, was "subscribed capital stock" in the strict and technical sense of the phrase. The balance of the stock, to wit, twenty-four thousand seven hundred and fifty shares, of the par value of $2,475,000, had been issued some months prior to that time, and turned over to the stockholders of the Powell Street Railway Company and the Park and Cliff House Railway Company as part of the consideration for the properties of various kinds transferred by them to the defendant corporation. Under the facts of the aforesaid transaction, we are firmly convinced that this twenty-four thousand seven hundred and fifty shares of stock was subscribed capital stock, within the meaning of section 309. We think that any stock issued for a valuable consideration, at least for any of those valuable considerations named in section 359 of the Civil Code, is "subscribed capital stock," as the phrase is used in this chapter of the code. Such has been the construction inferentially placed upon this provision of the law ever since its creation. To our knowledge, it has never been assailed or doubted. That such was the intention of the law-making power is apparent when we consider section 322, as to the stockholder's liability to the creditors of the corporation. In that section it is provided: "Each stockholder of a corporation is individually . . . . liable for such portions of its debts and liabilities as the amount of stock or shares owned by him bears to the whole subscribed capital stock . . . . of the corporation, and for a like proportion only of each debt or claim against the corporation." If plaintiff's

contention be sound, then under this provision he, owning one hundred shares of the subscribed capital stock, and there being but two hundred and fifty shares in all of subscribed capital stock, would be liable for two-fifths of this debt of $1,700,000, if it was sought to recover it from the stockholders. If such conditions should ever present themselves, we venture to believe that plaintiff's views of the law would undergo a radical change, and that he would earnestly insist upon the holders of the twenty-four thousand seven hundred and fifty shares paying their proportion of this vast indebtedness. It is too plain for argument that the holders of the twenty-four thousand seven hundred and fifty shares (if the transfer was not fictitious), wherever they may be, and whoever they may be, would be liable for their respective proportions of this indebtedness; and, if liable as stockholders, then certainly their own stock must be held to form a part of the great whole that section 309 terms the "subscribed capital stock," and which great whole forms the amount which is absolutely necessary to be determined before any stockholder's personal liability can be fixed.

Section 331 of the Civil Code provides for the levying of an assessment upon the subscribed capital stock for certain purposes. In Stockton etc. Agricultural Works v. Houser, 109 Cal. 1, 41 Pac. 809, a case was presented where the corporation directly issued to the defendant four hundred shares of its stock in consideration of the transfer to it of a certain factory, plant, etc. In that case the corporation treated these four hundred shares as subscribed capital stock not fully paid up, and brought an action, under section 331, to recover an assessment levied thereon. This court held that the action could be maintained and a recovery had. In one of the briefs filed in the interest of this appellant, it is conceded that stock issued by the corporation in consideration of coin in the hand would be subscribed capital stock. Such concession admits too much for plaintiff's cause, for the statute itself (section 359) provides: "No corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness is void." It will thus be observed that coin paid in hand for issued stock makes that stock no different and no more valuable than though it was issued for labor

done, or issued in exchange for property received, as in the case just cited.

To make sure what is already certain, we add another consideration for the conclusion we have reached. Section 322 contemplates that a creditor may recover his claim in full from the stockholders. It would seem that their insolvency only could defeat such recovery. Every stockholder is liable for a certain proportion of the creditor's debt, and the sum of the liabilities of all the stockholders is equal to the creditor's claim, but their respective liabilities are proportionate to the subscribed capital stock. Hence all the stock held by all the stockholders must be equal to the subscribed capital stock. Of course stock subscribed, and not yet issued, bears its proportion of a creditor's debt.

The value of the property received by the defendant corporation, as shown by the bill, was at least $1,200,000. Deducting the assumed indebtedness of $1,050,000, we then find the consideration for this issue of twenty-four thousand seven hundred and fifty shares was property of the value of $150,-000; and, when we consider that the plaintiff fails to show that the defendant corporation owned a dollar's worth of property at the date of this transaction with the other two corporations, we are not prepared to say but that full cash value was paid for this issue of stock, and upon this state of facts, as against the pleader, we will assume such to be the fact. Under no circumstances would we be justified in declaring the issue fictitious and void. In considering the meaning of the word "fictitious," as used in this connection, this court said in Stein v. Howard, 65 Cal. 616, 4 Pac. 662: "It may very properly be said that the use of the word 'fictitious' in the constitution, as above quoted, was as in contrast with the preceding sentence—as if to say that stock issued for money paid, labor done, or property actually received (price not named) is not fictitious." For the foregoing reasons we conclude that the "subscribed capital stock" of the defendant corporation, at the time its issue of bonds was made, was $2,500,000, and it follows therefrom that such issue did not create a debt in excess of its subscribed capital stock.

The plaintiff in bringing this action as a dissatisfied stockholder stands in the shoes of the defendant corporation. His wrongs are the corporation's wrongs. He can have no other. He is acting for the corporation, and is a mere nominal plain-

tiff. The corporation is the real party in interest, and any judgment recovered inures to its benefit to the full extent, as if it were the plaintiff in name, and was actively prosecuting this litigation. These things being true, plaintiff has no more right in this litigation, nor is he allowed to do anything, or urge any grounds for relief, which would not be equally potent in a court of equity if the corporation itself was seeking redress for the same real or imaginary wrongs. Keeping these things in view, let us examine the transaction of 1888, wherein the deal was consummated of transferring all the property rights of the Powell Street Railway Company and the Park and Cliff House Railway Company to the defendant corporation, in return for an assumption upon its part of an indebtedness of $1,050,000, and an issue and delivery by it of twenty-four thousand seven hundred and fifty shares of its stock in certain proportions to the stockholders of these two corporations. Conceding plaintiff to be so situated as to have a standing in this litigation which entitles him to assail this transaction, let us consider of what fraudulent acts does he complain, how has he been injured, and what relief does he seek? It is charged that the issue of stock made at this time by the defendant corporation was void and fictitious, as having been made without consideration; but we have already seen that such was not the fact, and that it passed for a very valuable consideration. It is also charged that the five defendant corporation directors converted this issue of stock to their own use. Well, if it was their stock, if the issue and transfer of it to them, as stockholders of the two vendor corporations, was a valid issue and a valid transfer, it was their property, to do with as they pleased, and it was not for this plaintiff, or anyone else, to complain of any disposition of it that to them seemed fit and proper. It is alleged that they sold portions of this stock, and converted the proceeds to their own use. If it was their stock, they had the undoubted right to convert the proceeds. It is also said the transaction was void because the defendant corporation thereby assumed an indebtedness in excess of its subscribed capital stock, but this contention we have shown possesses no merit.

Again, how was plaintiff injured by this transaction? How was his corporation injured? What injury does he allege? Absolutely none. If no such deal had taken place, there

never would have been $400,000 of net earnings to law about. There is no allegation in the voluminous bill that this defendant corporation owned a dollar's worth of property at the date of this transaction, and we assume that it did not. Prior to that time what was its stock worth, if it owned no property? What is the actual cash value of a share of stock of a corporation that owns no property, and is without even a prospect of ever owning any? And such was the situation of this defendant corporation when this deal was perfected. The plaintiff shows in his pleading that by this contract the defendant corporation made a profit of $150,000, for it received $1,200,000 worth of property by the assumption of a debt of $1,050,000, and, consequently, must have received for its issue of stock, which was practically valueless at that time, the above sum of $150,000. Assuming the plaintiff to have been a stockholder prior to the time when this transaction was consummated, was his stock more valuable before or after? By any mathematical computation possible, the value of his stock was increased six dollars per share. Again, if plaintiff purchased his stock prior to this transaction, as he insists, the corporation owning no property whatever, not even a franchise, it was nothing but a shell, and we are justified in assuming that he paid less for his stock than he did these five defendants for the twenty-four thousand seven hundred and fifty shares. Upon the showing made by the bill, no injury resulted to the defendant corporation from the transaction, and the practice of a few such wrongs would have made the plaintiff a millionaire.

There is no principle of equity which would allow this plaintiff to attack that transaction. He does not propose to do the fair thing. He asks the court directly by the prayer of his bill to give him all the benefits which his corporation secured by the trade, and to relieve him from every burden assumed. He wants to retain all the property received from the other two corporations, and at the same time have the defendant corporation's issue of stock and its assumption of the bonded indebtedness both declared void. If the corporation was here as plaintiff asking such relief, it would present a spectacle not pleasant to the eyes of a court of equity; and yet a corporation has no heart and no soul, and therefore may not always appreciate what is exact justice between man and man. It surely follows that this sight is

no more pleasant for equity to behold when presented by a living, breathing plaintiff. At this point another reason at once presents itself why the issue of stock by the defendant corporation should not be declared void and fictitious. It was issued in pursuance of a contract, as part of an immense business transaction, and as part of the consideration for the transfer of vast property interests. That transaction is one and inseparable. It must stand or fall altogether. And that issue of stock cannot be set aside and canceled unless the whole transaction is set aside and canceled. The burdens and benefits are inseparably connected. To hold otherwise would sanction injustice and dishonesty, and no court will be found to so declare.

Is the plaintiff entitled to an accounting as to the $650,000 issue of bonds and the $400,000 net profits earned? It is alleged that these net earnings have been applied to the payment of interest upon outstanding bonds. It follows that, if the bonds are valid, the moneys have been properly applied. As to the first two issues of bonds, amounting to $1,050,000, we hold them to be valid. Again, all bonds of the $650,000 issue in the hands of bona fide holders are certainly good and valid bonds. There is no allegation in the bill that any of the $650,000 issue are not now in the hands of bona fide holders. We then assume them to be in such hands, and the result flows from such assumption that the $400,000 of net earnings have been legally expended.

We have already disposed of plaintiff's main attack upon the validity of the $650,000 issue of bonds of the defendant corporation. But he has inaugurated many others of lesser importance. Some of his positions are not well taken, while others are so defective in statement as to go for naught when assailed by technical demurrer. As illustrative of these allegations we cite the following: "That six per cent bonds, legally issued and properly secured, were worth much more than their face value, to wit, fifteen per cent more in this market." As an allegation that the six per cent bonds issued by this defendant corporation were worth fifteen per cent premium, this is a total failure. Again: "That plaintiff is informed and believes that for the purpose of more fully concealing their method of appropriating the bonds and moneys of each and all of said corporations . . . . defendants Martin and Ballard (with the consent and connivance of de-

fendants Adams, Magee, and Lynch) furnished the materials and provided the labor to work and equip said railroad systems under the firm name of W. H. Martin & Co.; that large profits were made and charged against the defendant corporation by said W. H. Martin & Co.; that no accounting has ever been had with either of said corporations, or body of the stockholders thereof, in reference thereto." If this language amounted to an allegation of fact, it would seem that the liability set out would be a liability against Martin and Ballard. They made the profit, and should refund it. Doing these things "with the consent and connivance of the defendants Adams, Magee and Lynch" is hardly a sufficient allegation to show a liability against them. Yet, conceding their liability, it would be a different liability from that of Ballard and Martin. But plaintiff only alleges that he "is informed and believes" these things. This is not a good allegation. A denial that plaintiff "is informed and believes" would create an issue of no importance to the litigation. The defendants should not be called upon to answer allegations of this kind, and as to such matters the court was fully justified in sustaining the demurrer.

We conclude our investigation with a passing notice of one additional matter. At the date of the deal between these corporations the directors of all of them were the same. If the defendant corporation had other stockholders than its five directors, the plaintiff probably stood alone in that capacity. As already shown, eliminating his interest, this transaction was unassailable from all points; but, allowing his status as a stockholder at that time, the mere fact that these corporations dealt with each other, all having the same board of directors, does not stamp the transaction void ipso facto. It is no more void than though one director should sell his corporation a plant for the conduct of a factory. Under any circumstances, it would only be voidable: Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 23 L. Ed. 329; Hammond v. Hopkins, 143 U. S. 224, 36 L. Ed. 134, 12 Sup. Ct. Rep. 418; Barr v. Railroad Co., 125 N. Y. 263, 26 N. E. 145. If the contract was made in good faith; if it was profitable to the stockholders of the defendant corporation; if, as we have shown in this case, the defendant corporation received at least $150,000 worth of property for nothing— we hardly see how a dissatisfied stockholder, indulging in

the wild presumption that such a one could be found, would be able to avoid it in a court of equity. It would not seem that one dissatisfied stockholder could avoid it, if one hundred others were satisfied with and actively approved it. Under those conditions he would have no cause of complaint. He would show no equity, and a chancellor would not listen to him for a moment. On the face of the bill it would appear that he was not truly representing the corporation, viz., the stockholders, and he would have no standing in court. "The rule is well established that, unless under peculiar and exceptional circumstances, a court of equity will not interfere to set aside a transaction in itself voidable only, unless it appears that the complainant has sustained or may sustain some damage": Hill v. Nisbet, 100 Ind. 354. Mr. Thompson, in his work on Corporations (volume 4, section 4492), says: "Moreover, the conduct complained of must work substantial injury to the corporation, or at least to the complaining stockholder. If the injury is slight and inconsiderable, and affects all stockholders alike, and no other stockholder complains, it will not afford ground of equitable relief: Citing Albers v. Exchange, 45 Mo. App. 206. Thus it was held that a purchase made by a corporation would not be set aside because one of the directors was shown to have been interested in it, where it wrought no damage to the complaining stockholder: Citing Hill v. Nisbet, 100 Ind. 341. So, where a contract with a corporation is fulfilled to the satisfaction of the directors, and it appears that the work is beneficial to the corporation and done on favorable terms, a court of equity will not enjoin the payment of the stipulated compensation, on the allegation of one of the stockholders that there is a secret agreement between one of the directors and the contractor to divide the profits: Citing Havens v. Hoyt, 59 N. C. 115. So, where a corporation was insolvent and unable to continue its business, and the directors sold the corporate property to a new corporation, of which they were the officers and stockholders, and certain stockholders of the old corporation brought an equitable action, alleging that the property had been sold for less than its value, it was held that they could not undo the transaction, but could recover only the losses sustained by the old corporation by reason of the price received; and it appearing that the property sold for more than it was worth, and that the old corporation and the stock-

holders were the gainers through the transaction, it was held that the plaintiffs were not entitled to any relief: Citing Manufacturers' Sav. Bank v. Big Muddy Iron Co., 97 Mo. 38, 10 S. W. 865.'' It is conceded that there are transactions which courts of equity will set aside on grounds of public policy, simply because they operate to place the trustees in a position antagonistic to the interests of the cestui que trust, and this, too, regardless of any question of benefit to be derived by the beneficiary from the transaction. But, when the directors in making the contract are acting for corporations upon both sides, the application of that principle would seem to be somewhat different: San Diego, O. T. & P. B. R. Co. v. Pacific Beach Co., 112 Cal. 53, 33 L. R. A. 788, 44 Pac. 333. Still, this is not a contract opposed to public policy, and therefore is not void. We have no doubt but that this transaction could have been ratified by the stockholders of the defendant corporation, and, if that be so, public policy did not forbid it; for, if opposed to public policy, it would have been beyond all ratification.

It follows from what has already been said that the bill is demurrable upon grounds too numerous to mention. For the relief sought by the prayer there is a substantial nonjoinder of parties defendant. As against the parties defendant there is a fatal misjoinder of causes of action. The statute of limitations is a bar to a large portion of the relief sought. The bill is ambiguous and uncertain in scores of paragraphs. Necessarily the order of the trial court in sustaining the demurrer was legally sound beyond all doubt. And the only question remaining on which plaintiff may rest is that the court abused its discretion in not allowing him to amend the bill. The record nowhere discloses that he asked to amend, and, in the absence of such a showing, it must be presumed that he concluded to stand or fall upon his fifth complaint: Buckley v. Howe, 86 Cal. 605, 25 Pac. 132. But conceding to the contrary, and that he was anxious and ready to make the sixth effort, how can it be said that the trial court abused its discretion in denying his request? The present bill is the fifth attempt and fourth amended pleading. Having failed so signally upon a fifth effort, we are clear that the trial court in its discretion was fully justified in assuming that a sixth, seventh and eighth effort would likewise fail, and that the fault of the pleading did not lie in

the pleader, but in the facts. Plaintiff has labored for twenty-one months to make a proper pleading, and failed. He has been allowed time enough; at least it cannot be said that the trial court abused its discretion in ending the matter. The judgment is affirmed.

We concur: McFarland, J.; Van Fleet, J.

Opinion for reversal by BEATTY, C. J.:

This is an appeal by the plaintiff from the judgment of the superior court rendered in pursuance of an order sustaining the demurrers of the several defendants to a fourth amended complaint, and refusing leave to further amend. There is no bill of exceptions, and the record consists exclusively of the fourth amended complaint, the demurrers, the order sustaining them, and the judgment in favor of the defendants for their costs. The attempt of plaintiff to make an addition to this record by filing a certified copy of a demurrer to one of his former complaints is resisted by defendants, but since the only object of plaintiff is to show by this means that defendants are now estopped to raise some of the specific objections contained in their last demurrer, and since the objections which he thus seeks to obviate are immaterial, it will be unnecessary to consider either the amendment or the objections to it.

The complaint deals with a number of transactions, and is very long and involved. It does not follow a chronological order, or any order, and the facts are not alleged with the clearness and precision required in pleading. It contains much that is irrelevant, and is in several particulars uncertain and ambiguous. I shall endeavor to state, as well as I can in reasonable space, the facts upon which the plaintiff seeks to recover.

It is alleged that on or about the ninth day of December, 1886, the defendants W. B. Martin, John Ballard, W. J. Adams, Thomas Magee and H. H. Lynch "combined together, connived, and concocted a fraudulent scheme to acquire franchises to construct, equip, and operate street railroads in the city of San Francisco, state of California; to convey said franchises to the street railway corporations hereinafter mentioned, and organized by said defendants; to fraudulently and unlawfully issue to themselves, and thereupon divide among themselves, and convert to their own use, without sub-

scribing or paying therefor, the entire unsubscribed for shares of capital stock of each of said corporations, and to fraudulently issue said shares of stock, and enter the same upon the books of the corporations as fully paid shares, and thus deceive and mislead future purchasers of said stock and creditors of said corporations as to the financial condition of said corporations and the intrinsic value of said shares of stock, and by this means illegally obtain and maintain the control of said corporations and their franchises and affairs, by voting and using as their own property said unsubscribed and unpaid for shares of capital stock; to illegally vote to themselves, while members of the board of directors of said corporations, and thus receive and appropriate to their own use, divers and large sums of money as salaries, compensation for services and interest on money loaned by or through the directors of said corporations; to cause said corporations to illegally create bonded indebtedness vastly in excess of the amount of the subscribed capital stock of said corporations, and beyond the ability of each or any of said corporations to repay; to illegally issue to themselves and appropriate said bonds to the sole use and benefit of said defendants Martin, Ballard, Adams, Magee and Lynch; and to fraudulently appropriate to their own use the entire net earnings of said defendant corporation.''

I have presented this paragraph of the complaint in its literal terms, because it sets forth the alleged conspiracy, in pursuance of which all the subsequent acts of the five defendants named, whether wrongful, blameless or laudable, are charged to have been done.

The first thing they did was to obtain, by means of ordinances of the city of San Francisco (and without paying the city anything therefor), various franchises for the construction and operation of street railways. Throughout the complaint and argument on the part of plaintiff it is assumed, as one of the material facts of the case, that these franchises —covering many miles of the streets of the city—were of no pecuniary value; the only basis of the assumption being the fact, recited in parentheses, that the defendants Martin et al. paid the city nothing for them. I merely wish to remark, in passing, that the fact assumed cannot be inferred from the fact stated, and, even if it could, this is not the way to plead issuable facts. I think, moreover, the plaintiff would scarcely

have been willing to verify by his oath a complaint alleging in direct terms that these franchises were of no pecuniary value.

The next thing the organizers (so, for the sake of brevity, I shall hereafter designate the five defendants, Martin, Ballard, Adams, Magee and Lynch) are said to have done was to organize, December 9, 1886, a corporation known as the Powell Street Railway Company. The proposed capital stock of this company, as shown by its certificate of incorporation, was $2,000,000, divided into twenty thousand shares, of the par value of $100 per share. Each of the organizers subscribed in writing for forty of the shares, which was barely a sufficient subscription to enable them to incorporate under the laws of California, and thereupon they closed the subscription list. Afterward, it is said, they all duly became stockholders in said corporation to the extent of forty shares each; which means, I suppose, that they paid in at least ten per cent upon their subscriptions, and received, and duly receipted for, certificates of stock. It is next alleged that, except the aggregate subscription of two hundred shares, of the par value of $20,000, made by the organizers, "no other shares of the capital stock of said corporation were ever subscribed for or paid for by any other person, association, or corporation." On October 13, 1887, the same defendants organized the Park and Cliff House Railway Company, with a nominal capital stock of $500,000, divided into five thousand shares, of which each of the organizers subscribed for twenty shares, whereupon the subscription list was closed; and on December 14, 1887, they organized the Ferries and Cliff House Railway Company, with a nominal capital stock of $2,500,000, divided into twenty-five thousand shares, of which each of the organizers subscribed for fifty shares, whereupon the subscription list was closed. In these corporations, also, it is said, that all of the organizers afterward duly became stockholders to the extent of their respective subscriptions; which means, as I again infer, that they made the necessary payment of at least ten per cent upon their subscriptions, and received and receipted for their stock certificates. As to these companies, also, it is alleged that, except the subscription of one hundred shares, of the par value of $10,000, in the Park and Cliff House Company, and two hundred and fifty shares, of the par value of $25,000, in the Ferries and Cliff

House Company, "no other shares of said corporations were ever subscribed for or paid for by any other person, association or corporation." But this allegation, in the mouth of this plaintiff, is shown by other parts of the complaint not to mean all that the pleader might be supposed to have intended; for it appears that all the stock of the Powell Street Company and all the stock of the Ferries and Cliff House Company, over and above the respective amounts originally subscribed for, was subsequently issued in exchange for property and franchises. In effect, therefore, the allegation amounts only to a statement of the pleader's conclusion that stock issued in exchange for property or franchises transferred to a corporation is neither subscribed nor paid for.

Another legal conclusion stated in this connection is that each of these corporations, although organized at different times, was but a corporate agency to carry out the scheme and devices alleged in the complaint; that they were practically one and the same corporation, were so treated by the directors, and, finally, were all "unified" in the defendant corporation. To support this general statement, the following facts are alleged: That from the time of the organization of said corporations down to the commencement of this action the organizers have been the self-elected directors and principal officers thereof, or have had those positions filled by certain dummy stockholders, who were their mere servants or agents, voting and acting on all occasions as the organizers directed. That from the dates of the several transfers and assignments to the Ferries and Cliff House Company of the properties and franchises of the other companies, as subsequently alleged, "neither said Powell Street Railway Company nor Park and Cliff House Company have ever possessed, claimed, or exercised any greater or other benefits from their said acts of incorporation than the right to keep alive their several corporate names, and said corporations have since the said assignments remained and continued dormant and inactive corporations; they have transacted no business, and have had no officers, offices, clerks or employees of their own, but maintain ostensible offices, and are served whenever service is necessary at the places of business and by the clerks and employees of the defendant corporation."

On the 22d of December, 1886, occurred the first meeting of the directors of the Powell Street Company. All the

directors (the organizers) were present, and, since they owned all the stock, all the stockholders were present. At this meeting it was unanimously resolved that the company would issue nine thousand eight hundred of its shares (making, with the two hundred shares originally subscribed, ten thousand shares) to the organizers in exchange for all the franchises, privileges, rights of way and easements granted to or conferred upon them by orders (of the city) numbered 1871, 1881 and 1882. At the same meeting it was also resolved, nem. con., to issue to the Bay Shore and South San Francisco Railway Company the remaining ten thousand shares of the Powell Street Company's stock in exchange for a transfer of "all franchises, easements, privileges, rights of way, property owned by it by order No. 1856." All this stock (nineteen thousand eight hundred shares) was to be issued as "fully paid up." These resolutions were subsequently carried into effect by the transfer of the franchises, etc., and I suppose by the issuance of the stock, although that fact is nowhere expressly alleged. Upon the organization of the Park and Cliff House Company certain other franchises, rights of way, etc., derived from the city and from other sources, were transferred to that company by the organizers, but whether or not any stock was issued to them in exchange for this transfer we are left to conjecture. As against the plaintiff, however, the silence of the complaint on this point makes against him, so far as the invalidity of the acts which he assails depends upon the nonissuance of this stock; and therefore I assume that the stock of the Park and Cliff House Company was issued to the organizers in the same way that the stock of the Powell Street Company was issued to them, and to the Bay Shore and South San Francisco Company. This being the condition of the two corporations—Powell Street Company and Park and Cliff House Company—as to organization and distribution of stock, on February 17, 1887, the organizers, being all present and duly convened as a board of directors of the Powell Street Company, caused said company to create an indebtedness by the issue of $700,000 of bonds, bearing interest at the rate of six per cent, and on July 30, 1887, caused said corporation to make, execute and deliver to "John R. Jarboe and Thomas Brown, as trustees for the benefit of the holders of said bonds, a trust deed or

mortgage of all the property, real and personal, rights, interests, and franchises, vested and contingent, of said corporation, and also all rights of way and all street railroads then laid or to be laid by said corporation, and all motors, engines, and rolling stock belonging to said company.'' This mortgage, or trust deed, was duly recorded on September 10, 1887, and on September 12th all of said bonds—$700,000 in amount —were delivered to Martin and Ballard, who, it is alleged, converted them to their own use. (The exhibit attached to the complaint—Exhibit C—shows that at this date neither Martin nor Ballard was a director of the company, and it also shows that the bonds were issued for the purpose of constructing the Powell Street Railway.)

On December 19, 1887, the organizers caused the Park and Cliff House Company to create a bonded indebtedness of $350,000, secured by deed or mortgage to the same trustees— Jarboe and Brown—which deed was duly recorded April 26, 1888. These bonds, also, were all issued and delivered to Martin and Ballard on March 5, 1888, ''as payment and compensation for and in full of their services for building and equipping the road of this [Park and Cliff House] corporation.'' Four only of the directors were present at the meeting when this order was passed, and two of them were Martin and Ballard. The value of the road constructed by them under the franchises of the Park and Cliff House Company is alleged never to have exceeded $200,000.

On December 29, 1887, the organizers, being all present and duly organized as a board of directors of the Ferries and Cliff House Company, in consideration of five dollars and the transfer and assignment of all the franchises and other property of the Powell Street Company, passed a resolution and executed a contract with Brown and Jarboe, its trustees, to the effect that the Ferries and Cliff House Company would assume and become primarily liable for the bonded and other indebtedness of the Powell Street Company. It was also a part of the consideration for the transfer of the Powell Street Company's property that twenty thousand shares of the stock of the Ferries and Cliff House Company should be issued to the stockholders of the Powell Street Company—so apportioned that for each share they held in the latter company they would receive one share in the former. This part of the agreement was subsequently carried out in accordance with

a resolution of the organizers, acting as the board of directors of the Ferries and Cliff House Company, on January 22, 1888. In the body of the complaint it is charged that all this (twenty thousand shares) was issued by the organizers to themselves, but Exhibit C shows that one-half of it was issued to the Bay Shore and South San Francisco Company, and it does not appear from any part of the complaint that this corporation was, as plaintiff assumes in his argument, composed of the same five persons who organized the other corporations, or that they were interested in it to any extent whatever.

On March 5, 1888, a similar transfer and assignment of all the franchises and other property of the Park and Cliff House Company was made to the Ferries and Cliff House Company in consideration of its assumption of the bonded and other indebtedness of the Park and Cliff House Company, and the issuance of the remaining four thousand seven hundred and fifty shares of its stock to the stockholders of the Park and Cliff House Company in proportion to their respective interests therein. All of this stock (twenty-four thousand seven hundred and fifty shares) was by the express terms of the resolution of the organizers, acting as directors of the Ferries and Cliff House Company, declared to be, and issued as, "fully paid," and soon after its issuance was put upon the market by the organizers and sold to the extent of several thousand shares. It was listed in the stock board and quoted at from $30 to $70 per share, and plaintiff, in ignorance of the manner in which it had been issued, purchased one hundred shares of it as a permanent investment. He also purchased one hundred of the two hundred and fifty shares originally subscribed for, but when his respective purchases were made, in what order, or for what price, we are left in ignorance. The allegation is: "That heretofore, to wit, in the month of February, 1888, plaintiff became, ever since has been, and still is, a stockholder of record on the books of defendant Ferries and Cliff House Railway Company, and at the time of the commencement of this action was, and still is, the owner of, to wit, one hundred shares of the subscribed capital stock of said defendant corporation." By this we are expected to understand that in February, 1888, the plaintiff became the owner of record, and has ever since so continued, of one hundred of the two hundred and fifty shares

originally subscribed by the organizers. But, obviously, it does not necessarily mean anything of the kind. He might have become a stockholder of record on the books by his purchase of one share of the stock he treats as fictitious, and only acquired the genuine stock the day before he commenced the action. However, as it is not, in my view, at all material which or how much stock he purchased in February, 1888, I shall assume that it was as plaintiff contends he has alleged it.

Plaintiff never was a stockholder in any of these corporations except the Ferries and Cliff House Company. With the Powell Street Company and the Park and Cliff House Company he had nothing to do, except in so far as he is brought into connection with them by the fact that their roads, franchises, and other property became a part of the "system" of the Ferries and Cliff House Company by means of the transactions above detailed. This "system," it seems, was, at some time subsequent to his becoming a stockholder, completed and put in operation. Highly favorable reports of its success were made by its officers. Net earnings were said to be accumulating, and dividends would soon be regularly paid. The plaintiff, in reliance upon these reports and the good faith and business capacity of the organizers, paid assessments upon his stock to the extent of $2,400, and for about three years waited patiently for dividends. None being forthcoming, he began to grow suspicious, and instituted inquiries into the condition and management of the corporation and the companies which had been "unified" in it. It is not clear from the complaint which or how many of the facts above detailed he discovered after this time, but his argument implies that he then first became aware of the manner in which the stock of the various companies had been issued and manipulated, of the extent of their bonded indebtedness, the circumstances of its creation, and the disparity between the value of the corporate property and the extent of the corporate obligations. His investigation also was delayed and protracted by the denial of his right to examine the books of the corporation, and by its neglect to keep and preserve proper books, records and vouchers, and especially by the absence of any construction accounts. However, he did discover, either then or after the filing of his original complaint (December 10, 1892), the facts above stated, and the further fact that, in addition to the assumption of the bonded debt of the Powell

Street Company ($700,000), and of the Park and Cliff House Company ($350,000), the organizers had, on the thirteenth day of February, 1889, while acting as the board of directors of the Ferries and Cliff House Company, created a bonded indebtedness for that company of $650,000, making a grand aggregate of $1,700,000 of bonded debt. These bonds, like others, were secured by mortgage or deed of trust of the corporate property to Brown and Jarboe, trustees, and, like the others, the bulk of them were handed over on December 11, 1889, to Martin and Ballard in settlement of their demands for construction of road, etc., which demands, it is alleged, were fictitious. A smaller portion of these bonds was at the same date issued to others of the organizers upon claims not very clearly defined, and the balance was subsequently disposed of to raise money to pay interest on the bonds previously issued or assumed by the corporation bonds originally issued to, and to a large extent still held by, the organizers themselves. This further issue of bonds by the Ferries and Cliff House Company was the act of the directors alone, without notice of any kind to the stockholders, and the bonds, all of which went into the hands of the directors themselves, were accounted for at par, when, as it is charged, they were actually marketable at fifteen per cent premium. It is further alleged that all the property of the Ferries and Cliff House Company, aside from certain property paid for with money raised by assessment upon the stockholders, is of no greater value than $1,200,000 (this, however, excludes, I suppose, the value of its franchises, which, on the theory of the plaintiff, are worth nothing, because they cost nothing); that its business since the completion of its "system" has been extremely profitable, resulting in net earnings of $400,000, all of which have gone to pay interest and certain unfounded demands and unauthorized expenditures of the organizers. Another allegation upon which plaintiff greatly relies is this: "That, in furtherance of said fraudulent scheme, no meeting of the stockholders of any of said corporations, other than as herein specified, was ever called or held for the purpose of fixing the amount of the capital stock required for the construction, equipment and operation of either of said railroads; and none of the officers of either of said corporations have ever sworn to or filed in the office of the Secretary of State a certificate showing the amount of stock fixed at such meeting,

nor that the whole of the subscribed capital stock of each of said corporations has been fully paid up, as is by law required.'' Other matters set forth in the complaint, including the facts alleged by way of excuse for delay in bringing the action, and the numerous conclusions of law which constitute a large portion of its bulk, can be more conveniently stated in the course of the discussion in connection with the propositions in which they are involved.

The action was commenced by the plaintiff on the tenth day of December, 1892, in behalf of himself, the defendant corporation, and all other stockholders who might elect to be joined as coplaintiffs. Originally, it is said, it was an action for discovery, but by legal development it has become an action for an accounting, which, in view of the voluminous prayer for specific relief, is, I think, rather too modest a statement of its aim and scope. It is not easy, indeed, to make a brief statement of the relief claimed. The first and most important item is that the Ferries and Cliff House Company shall be decreed to be the owner of all the property ever owned or possessed by the Powell Street Company or the Park and Cliff House Company, and that neither of those companies has any interest in or claim to any of said property. Here plaintiff seeks a decree quieting title against two corporations not parties to the action. He contends that they are unnecessary parties, because they are dormant, inactive, etc., and because their stockholders are parties. But this is not true, for half of the stock of Powell Street Company is shown to have been issued to Bay Shore Company, and it is not shown that the organizers have any interest in that company. Here, therefore, would be a defect of parties defendant if any case was presented for a decree quieting title. But, really, there is no such aspect of the case. Neither corporation is alleged to be asserting any adverse claim, and if they were they could not be joined as defendants, unless they were claiming the same property.

The next item of relief prayed is that it may be decreed that no portion of the capital stock of either of said railway companies was ever subscribed for or lawfully issued, except two hundred shares of the Powell Street Company, one hundred shares of the Park and Cliff House Company, and two hundred and fifty shares of the Ferries and Cliff House Company. Third. That the transfer by the organizers, act-

ing as directors, to themselves, of twenty-four thousand seven hundred and fifty shares of the Ferries and Cliff House Company's stock, was fraudulent, fictitious, inoperative and void. Fourth. That the organizers hold said twenty-four thousand seven hundred and fifty shares as trustees of the corporation; that it be returned to the treasury of the company, and there remain as its property. Fifth. That the agreement of December 29, 1887, between Ferries and Cliff House Company and Jarboe and Brown, by which that corporation assumed the payment of $700,000 of Powell Street Company's bonds, was the unlawful creation of a bonded indebtedness as to all in excess of $20,000; and that the agreement as to such excess was fraudulent, fictitious, inoperative and void. Sixth. That the agreement as to Park and Cliff House bonds, as to all in excess of $5,000, be similarly dealt with. Seventh. That the $650,000 bonds of Ferries and Cliff House Company, and the deed to secure them, as to all in excess of $25,000, were fraudulent, fictitious, etc.; that the bonds be given up and canceled, and the mortgage satisfied of record. Eighth. "That the said defendants W. H. Martin, John Ballard, W. J. Adams, Thomas Magee, and H. H. Lynch account to the said Ferries and Cliff House Railway Company for all moneys received and gains made by them, or either of them, as commissions, emoluments or profits claimed or taken in their, or either of their, own names, or in the names of their, or either of their, agents, representatives or servants, or of any other person or persons acting for or controlled by them, or either of them, as directors or employees of the Ferries and Cliff House Railway Company, defendant in this action." Ninth. "That they, the said defendants W. H. Martin, John Ballard, W. J. Adams, Thomas Magee and H. H. Lynch, directors and officers of the defendant corporation, be made to account for and pay over to said defendant Ferries and Cliff House Railway Company the net earnings of said defendant company from the twenty-eighth day of March, 1888, to the day and date of said accounting." Tenth. That the organizers be enjoined from transferring stocks or bonds and from paying interest on bonds in excess of $25,000; that plaintiff may recover punitive damages, etc. Eleventh. That Ferries and Cliff House Company may have a joint and several judgment against defendants, as fiduciary trustees, for what they have misappropriated, and for costs, and general relief.

By these various prayers the plaintiff has no doubt asked for relief against corporations and other persons who are not parties to the action, for relief in one action against different persons as to whom the causes of action are distinct, and for relief to which he is in no event entitled. But, in determining the sufficiency of his complaint, these inconsistencies of the prayer may be disregarded.

The relief asked in the first clause is wholly outside of the case, for the reasons above stated. The other clauses of the prayer, from the second to the eleventh, inclusive, all bear upon the accounting which he demands as against the organizers. So far as they ask a decree invalidating large issues of stocks and bonds which may have passed into the hands of bona fide purchasers, I do not understand that the plaintiff hopes to obtain a judgment binding in this respect upon any person not a party to the action. The only defendants against whom this relief is prayed, except the organizers, are Jarboe and Brown, who are alleged to have taken the stock held by them (if any) with full knowledge of all the circumstances attending its issuance. It is alleged that large amounts of the bonds are held by transferees of the organizers unknown to plaintiff, who took them with notice of their invalidity, and he asks leave, when their identity shall be discovered, to serve them and bring them in as defendants, which he has the undoubted right to do. Until they are so brought in he does not claim or expect a decree binding upon them as to the validity of their bonds. As against the organizers, however, he does claim that the court should decree, as the basis of their accounting, that there is no valid indebtedness of the Cliff House and Ferries Company in excess of $25,000, and no valid stock in excess of two hundred and fifty shares; that they (and their transferees, with notice, when discovered and made parties) must give up for cancellation such stocks and bonds as remain in their hands, and that they must account to the corporation for the true value of all unlawfully issued stocks or bonds that have become valid obligations, by transfer to innocent purchasers, if any such there be, and especially that they must restore to the treasury of the corporation the money they have expended to pay interest upon the bonds, for the issue of which they are solely responsible, and the proceeds of which he alleges they have fraudulently converted to their own use.

No doubt the demands of the plaintiff are grossly extravagant. The net result of the decree he asks would be, as defendants point out, that his corporation would own property of the admitted value of $1,400,000, exclusive of its franchises, to which at the time of filing his last amended complaint there was $400,000 of net earnings to be added. Against this there would be a debt of only $25,000, and of the balance of $1,775,000, exclusive of the franchises, he, as the holder of one hundred of the two hundred and fifty valid shares, would be the owner of two-fifths, i. e., he would have $710,000 in return for an investment of something less than $20,000. But, if the claims of plaintiff are extravagant, it is equally true that the net result of denying him any relief would be the total loss of all he has honestly invested in the shares of the company, and of his legitimate share of the profits of an enterprise which, according to the facts admitted by the demurrers, has been extremely successful.

I shall endeavor to show that the justice of the cause lies somewhere between these extremes, and that justice is not unattainable in this proceeding. The first proposition upon which plaintiff relies in support of his claims is that there never was any subscribed stock in either of the three corporations besides the shares subscribed for preliminary to their formation, viz., two hundred shares in Powell Street Company, one hundred shares in Park and Cliff House Company, and two hundred and fifty shares in the Ferries and Cliff House Company, and, consequently, that their respective bonded debts in excess of the par value of their subscriptions—$20,000, $10,000 and $25,000—were utterly void by reason of the statutory prohibition (Civ. Code, sec. 309) against the creation of debts in excess of subscribed capital.

This proposition is wholly untenable for several reasons. In the first place, the subscribed capital stock of a corporation referred to in section 309 of the Civil Code includes the entire lawful issue of the stock of a corporation, and is not limited to the shares formally subscribed for as a necessary preliminary to the filing of the certificate. To form a corporation, under the laws of this state, the projectors must file a certificate (Civ. Code, sec. 290), and that certificate must show, among other things: "(6) The amount of its capital stock and the number of shares into which it is divided; (7) if there is a capital stock, the amount actually sub-

scribed, and by whom.'' If it is a railroad corporation, there must be subscribed at least $1,000 for each mile of the contemplated work (Civ. Code, sec. 293), and the certificate must show that at least ten per cent of the subscribed capital stock has been paid in to the treasurer of the intended corporation (Civ. Code, sec. 291).

This shows that in forming a railroad corporation the first essential is the preliminary organization of persons willing to subscribe $1,000 per mile for the projected work, and to pay in to their provisional treasurer ten per cent of their subscription. For this purpose a subscription list must be opened, but it may be closed just as soon as a sufficient amount is subscribed to satisfy the statute. Such was the course pursued by these organizers, and the closing of the subscription lists signified nothing more than that they wished to proceed with the organization of the corporation without waiting for other subscriptions, or that they desired to keep it entirely under their own control. Whatever their motive, they did nothing in this matter that the law forbids or discountenances. Nor was their action a fixing of the capital stock of the corporations, within the meaning of section 458 of the Civil Code. The sections above referred to (sections 290–293) plainly show that the proposed capital stock is one thing, and the stock preliminarily subscribed is another, and that it never was the intention of the legislature to limit the issue of corporate stock to the amount subscribed as a condition or prerequisite to the filing of the certificate of incorporation. On the contrary, the law sanctions the practice, so long and so universally followed, of issuing, after incorporation, the shares not previously subscribed, up to the aggregate number mentioned in the certificate. How such issuance is to be regulated and controlled we need not stop to inquire, except so far as it concerns this case. Conceding that the directors have no power to issue them except at par, and upon payment of the same amount that has been called on previously issued shares, it cannot be denied that by unanimous concurrence of all the directors and all the stockholders they may be issued for less than their par value in money or in exchange for property; for who, in such case, could complain? The strictest limitation that is to be found upon the power of corporations to issue their shares is contained in section 11 of article 12 of the constitution, which provides that ''no corporation shall

issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void.'' Here, by the clearest implication, is permission given by the state to issue stock in exchange for labor or property, and stock so issued is neither fictitious nor void as to the public. If all the stockholders have consented to its issue, they cannot complain. Existing creditors are not affected by the issue, because their rights, as against stockholders, are measured by the issue and distribution of shares at the time their respective claims accrued. As to subsequent creditors dealing with the corporation upon the faith of its ostensible capital, they would have no cause of complaint unless they could show that they had been defrauded by an overvaluation of the property given in exchange for the stock, in which case they could have recourse against the stockholders: Handley v. Stutz, 139 U. S. 427, 35 L. Ed. 227, 11 Sup. Ct. Rep. 530, and authorities there cited. Stock issued in exchange for property is therefore not void, or even voidable, when it has been issued by unanimous concurrence of all the directors and all the existing stockholders of a corporation.

Applying the above reasoning to the action of the organizers in issuing the stock of the Powell Street Company and of the Park and Cliff House Company to themselves in exchange for street railway franchises, it appears that the issue was entirely regular and valid, for they all concurred in the act, and they owned all the previously issued stock. They were the whole corporation—directors, trustees and stockholders. The transaction was the simple and ordinary one of incorporating a business of any sort—commercial, mining or manufacturing—where the partners or co-owners put their mine or factory or stock in trade into a corporation and receive stock of the corporation in exchange. To attempt to invalidate such a transaction upon the ground that the directors, in issuing the stock to themselves, violate their duty as trustees of the stockholders, is absurd. They are themselves the stockholders, beneficiaries and trustees at the same time, and there can be no conflict of interest between them.

But the plaintiff contends that, although these stocks may have been lawfully issued, they do not constitute ''subscribed capital stock,'' within the meaning of section 309 of the Civil Code, which prohibits the directors of corporations from

creating debts beyond their subscribed capital stock. Both the constitution and the statutes of the state, however, use the phrase "subscribed capital stock" again and again to designate all the stock of a corporation which has been lawfully issued, whether formally subscribed for or not, as well as stock that has been subscribed for but not issued. And, indeed, the use of the expression in this sense is perfectly proper; for every stockholder necessarily subscribes in receipting for the certificate of his stock, and thereby binds himself to pay any call to which it is subject. Section 3 of article 12 of the constitution provides that each stockholder shall be individually and personally liable for such proportion of its debts as the amount of stock owned by him bears to "the whole subscribed capital stock." This clearly implies that all lawfully issued stock is ranked as subscribed stock. The same provision is contained in the statute (Civ. Code, sec. 322), where the phrase "subscribed capital stock" is used in the same sense and with the same implications. By section 331 of the Civil Code the directors are authorized to levy assessments only upon the "subscribed capital stock." Would plaintiff contend that no assessment can be enforced against a holder of stock unless he subscribed a formal agreement to take it before it was issued? Section 359 of the Civil Code provides that the capital stock of a corporation may be increased by a vote representing two-thirds of its entire capital stock. The word "subscribed" is here omitted. Why? Because there is no occasion to increase the capital stock of a corporation while any part of the stock named in its certificate remains unissued, and, when it is all issued, the entire capital stock and the subscribed stock are identical.

In Barron v. Burrill, 86 Me. 75, 29 Atl. 938, it was held, under a statute similar to our own, that the receipt of shares had the same effect in fixing the obligation of the shareholders to the corporation and its creditors as a regular subscription. To the same effect, see Handley v. Stutz, 139 U. S. 427, 35 L. Ed. 227, 11 Sup. Ct. Rep. 530; Sanger v. Upton, 91 U. S. 56–64, 23 L. Ed. 220; Chubb v. Upton, 95 U. S. 665, 24 L. Ed. 523; and see Stockton etc. Agricultural Works v. Houser, 109 Cal. 1, 41 Pac. 809.

The organizers did not, therefore, contract any indebtedness beyond the subscribed capital stock in issuing $700,000 bonds of Powell Street Company, and $350,000 bonds of

Park and Cliff House Company. And, even if there had never been more than $20,000 of Powell Street Company or $10,000 of Park and Cliff House stock subscribed or issued, the bonds in excess of those amounts would not have been affected by anything contained in section 309 of the Civil Code. The provision of that section relied on by the plaintiff merely restricts the power of the directors as agents of the corporation. It is designed, primarily, as a protection to stockholders, and, incidentally, to protect creditors, and, if observed, will have that effect. Here, however, the directors and stockholders were identical, and what the stockholders consented to they cannot complain of. There were no existing creditors, and those who became creditors by accepting the bonds would not be greatly benefited if the bonds were declared void. It would be a most singular method of redressing their grievances, if they have any.

It is not necessary to resort to the doctrine of Underhill v. Improvement Co., 93 Cal. 300, 28 Pac. 1049, to sustain the validity of these bonds, but, if it were, the decision in that case would furnish another complete answer to plaintiff's objections.

The next contention of plaintiff is that the respective debts of these several corporations are all invalid, because none of them has ever fixed its capital stock and filed the proper certificate of full payment, as required by sections 458 and 459 of the Civil Code. The law does not declare what shall be the consequence of a failure to comply with these provisions, and this complaint does not show that the conditions have arisen which would make it incumbent upon these companies to take the prescribed action. We need not, therefore, stop to consider the scope and object of this part of the law. It is sufficient for the present purpose to say that neither the sections cited nor section 456 impose any restriction upon corporations as to their power to contract debts, except that the debt must not exceed the capital stock. They are not required to fix their capital stock before contracting a debt otherwise than as it is fixed by the certificate of incorporation, and whether the amount of lawful indebtedness which they may incur is limited only by the statement in the certificate as to the amount of capital stock, or by the amount of stock subscribed, is a matter of indifference in this case; for not one of

these corporations has ever incurred a debt in excess of its "subscribed capital stock."

The next transaction of the organizers assailed by the plaintiff is their assumption in behalf of Ferries and Cliff House Company of the bonded debt of Powell Street Company, and the issuance of twenty thousand shares of the stock of the former company to the shareholders of the latter. This was determined upon in December, 1887, and consummated in January, 1888, before the plaintiff had become a stockholder, and while the organizers held all the stock of each of the two corporations concerned in the transaction. What has been said above, therefore, respecting the issue of stock and bonds by Powell Street Company and Park and Cliff House Company equally applies to the issue of this stock and assumption of this debt by Ferries and Cliff House Company. All that was done was done by unanimous concurrence of all the directors and all the stockholders. There could be no violation by the directors of their duties as trustees, because they were at the same time sole beneficiaries and sole trustees, and no conflict of interest between the individual and the representative was possible. The twenty thousand shares of stock were issued in exchange for property on terms expressly agreed to by every party in interest, and the issue was, as has been shown, lawful. The bonded debt was within the amount of the stock simultaneously subscribed, and was therefore a lawful issue, even if it had been the act of the directors alone, and a fortiori was lawful as the act of the entire body of stockholders, not in contravention of any constitutional or statutory inhibition, and not in conflict with any interest of creditors. Indeed, there appear to have been no creditors other than the holders of the bonds, payment of which was then assumed.

A special objection to the issuance of these twenty thousand shares of stock urged by plaintiff is that by the exchange of properties they took the place of the original capital of Powell Street Company, which the directors were forbidden to divide among the shareholders: Civ. Code, sec. 309. It is true that the organizers violated their duty as trustees of Powell Street Company by making a division of these shares (Kohl v. Lilienthal, 81 Cal. 378, 6 L. R. A. 520, 20 Pac. 401, 22 Pac. 689), and thereby subjected themselves to the liabilities to creditors and stockholders of that corporation prescribed by

the statute. But since they were the only stockholders, and the creditors appear to have consented to the transaction (they, it seems, were also the holders of the bonds and the only creditors), this transgression of the law by the organizers in their character of directors of Powell Street Company could not have the effect of invalidating the issue of Ferries and Cliff House stock. The plaintiff, at all events, is not in a position to raise the question, for he is not and never was either a creditor or stockholder of Powell Street Company.

In the month of February, 1888, then, at which time plaintiff first became a shareholder in Ferries and Cliff House Company, the affairs of that corporation, as shown by its books and records, were in this condition: Its certificate capital was $2,500,000, divided into twenty-five thousand shares, of which two hundred and fifty shares had been subscribed prior to filing its certificate, and twenty thousand shares subsequently issued as "fully paid up" in exchange for property by the act of all its directors, concurred in by all its stockholders. This issue of stock was, as has been shown, lawful, and the result was that the directors were thereby empowered by the stockholders to incur a bonded indebtedness of $2,025,000. This power they had exercised to the extent of assuming the payment of $700,000 of Powell Street Company's bonds. No stockholder was in a position to complain of anything they had done in the way of issuing stock or incurring indebtedness, and the plaintiff, as successor in interest to the person from whom he purchased his stock (whether it was part of that originally subscribed or of that which was subsequently issued), was in this respect in no better position than his assignor. If he bought stock without making any inquiry into the condition of the corporation, he must suffer the consequences of his own improvidence. If he made inquiry, and was deceived, he may have had a right to rescind as against his vendor, but he has no claim upon this score against the directors or other stockholders.

From this time forward, however—from the moment the organizers began to transfer the stock of the Ferries and Cliff House Company to outsiders; from the time, in other words, when the directors ceased to be their own sole beneficiaries—their acts and conduct must be judged by a different standard. They then became bound, in all matters connected with their

trust, to act with the highest good faith toward their beneficiaries. They could not deal with the trust property for their own profit. They could take no part in any transaction concerning the trust, in which they had an interest adverse to their beneficiaries, without their consent. In short, they became subject to the strict application of the law governing the relation of trustee and cestui que trust. The leading principles of that law are too familiar to require further statement, and, tested by those principles, the transaction by which the debt of Park and Cliff House Company (amounting to $350,000, and held by the organizers themselves) was assumed in behalf of Ferries and Cliff House Company, and four thousand seven hundred and fifty fully-paid shares of the latter company issued to themselves in exchange for property admitted by the demurrer to have been worth no more than $200,000, was a flagrant breach of trust, and a fraud upon plaintiff and all other stockholders in the same situation. The transaction, it is true, was substantially the same as that with Powell Street Company, except that it lacked the consent of all the stockholders of Ferries and Cliff House Company, but that difference was fatal (Civ. Code, sec. 2230) ; and a cause of action thereby accrued to the corporation, which, upon failure of the corporation to act, could be enforced at the suit of any dissatisfied stockholder.

It is contended, however, by respondents that this transaction, though voidable, was not absolutely void, and could therefore be validated by express ratification or by an implied ratification evidenced by acquiescence or by laches. This proposition is undoubtedly correct. The consent of all the stockholders of Ferries and Cliff House Company would have made the transaction with Park and Cliff House Company exactly as regular and legitimate as that with Powell Street Company, and as valid in every respect, and a subsequent ratification by all the stockholders would have been as effective as a previous consent. The only question is whether there has been any ratification. It is not pretended that there has been any express ratification by plaintiff or by any of the class of stockholders which he represents, but it is said that a rescission of the contract was the proper course and that a failure to rescind or to offer to rescind is ratification. This may be so in ordinary cases, but it is difficult to see how the doctrine can be applied to a dissatisfied

stockholder, who is entirely without the power to rescind the contracts of the directors. He has nothing under his control which he can restore or offer to restore, and his only remedy, in case of a failure or refusal of the directors to act, is to institute an action for the enforcement of such rights as he has. In this case I suppose the plaintiff might have demanded either one of two things: He might have asked the court to decree the rescission which he was powerless to effect, or he might have affirmed the transfer of the property, and compelled his trustees to account to the corporation for their profits. He has not, in his prayer for relief, confined himself to either of these alternatives, but has made the rather extravagant demand that the title of all the property formerly belonging to Park and Cliff House Company be confirmed to his corporation, and that all the bonds assumed and stock issued in exchange be declared void. He is, of course, not entitled to this measure of relief; but under his prayer for general relief, and in view of the facts, he could demand an accounting to the corporation for the excess of liabilities assumed and stock issued over the value of the property taken in exchange, unless his action is as to this matter barred by the statute of limitations. Here, however, I think the plaintiff encounters an insuperable obstacle. The transaction with Park and Cliff House Company took place March 5, 1888, and was at that time recorded in the books of Ferries and Cliff House Company. The plaintiff was at that time, and has ever since continued to be, a stockholder of the latter company. As such he had the right to inspect its books and records, and by inspecting them could have learned all the particulars of its dealings with Park and Cliff House Company. His cause of action was then complete, and although in cases of fraud the cause of action is not deemed to have accrued for the purpose of setting the statute of limitations in motion until the discovery of the fraud by the party aggrieved (Code Civ. Proc., sec. 338), still knowledge is imputed to those who have the means of knowledge at hand, and they cannot prolong their right of action by remaining in ignorance of that which they ought to know. Here the cause of action arose in March, 1888, and the means of knowledge were simultaneously placed in plaintiff's reach by recording the transaction in the books of his corporation. But he for

more than three years (the whole period of limitation) neglected to make any inquiry. His excuses are that he was absent from the state for considerable periods; that he had confidence in the directors, and was misled by their reports; and he believes he would have been denied access to the books if he had requested an inspection. I think these excuses are insufficient to relieve plaintiff from the consequences of his neglect, and that he is now precluded from attacking the assumption of the debt of the Park and Cliff House Company, or the issuance of the four thousand seven hundred and fifty shares of the Ferries and Cliff House stock, and also from demanding an accounting for that transaction.

But the statute interposes no bar to his demand for an accounting for the issue of $650,000 of Ferries and Cliff House bonds by the organizers to themselves. They were issued on and subsequent to the eleventh day of December, 1889, and the action was commenced December 10, 1892—one day short of three years after the wrong complained of. The action was therefore commenced in time, and there can be no doubt of the right of plaintiff, upon the admitted facts, to demand the accounting. The mere fact that the directors issued the bonds to themselves in payment of their own demands against the corporation, and that they have never accounted to the corporation, would, in itself, be sufficient to support the action; but it is also alleged, and by the demurrer admitted, that the bonds were taken by the directors at their face value when they were actually worth fifteen per cent premium, and that their claims for construction, etc., were for more than was justly due.

Plaintiff claims that none of the directors were entitled to receive anything for services or supplies furnished in the construction of the roads, and bases his contention on the provisions of section 18 of article 12 of the constitution, which reads as follows: "No president, director, officer, agent or employee of any railroad or canal company shall be interested, directly or indirectly, in the furnishing of material or supplies to such company nor in the business of transportation as a common carrier of freight or passengers over the works owned, leased, controlled or worked by such company, except such interest in the business of transportation as lawfully flows from the ownership of stock therein." I do not con-

strue this section as applying to the original construction of a railroad. By its terms it seems to be confined to the operation of the road when completed. But, however this may be, no penalty is prescribed for a violation of this provision, and the only consequence of its infraction is that contracts by officers of a railroad company to furnish it material or supplies would be invalid and unenforceable. But this would not preclude the allowance in an accounting of the just value to the company of any materials actually furnished by its directors and actually used in the business of the road.

The claim of the plaintiff that this whole issue of bonds of Ferries and Cliff House Company was void, because in excess of its subscribed capital, has been sufficiently answered. Another ground upon which their validity is attacked is that this was an increase of the bonded debt of the corporation without the consent of the stockholders, and therefore in violation of section 359 of the Civil Code. A careful reading of that section, however, as it stood prior to the amendment of March, 1889, in connection with other provisions of the code, leads to the conclusion that it only applied to those cases in which it was desired to create an indebtedness in excess of the stock which the corporation had the power to issue. In such cases it was necessary to increase the capital stock as a prerequisite to the increase of indebtedness, and for the increase of capital stock the consent of the stockholders is necessary. But when the existing debt of a corporation was within the amount of its subscribed capital, and a proposed addition to its indebtedness would leave the total amount still within the amount of its subscribed capital, this was not the increase of bonded debt contemplated by section 359 (as it existed February 13, 1889) requiring the consent of two-thirds of the stockholders.

There is, indeed, no objection that I can see to the validity of any of these bonds in the hands of bona fide holders. But so far as they remain in the hands of the organizers, or of their transferees, who took them with knowledge of the facts, they may be called in and canceled to the extent that they exceed the just and lawful claims of the directors of the company, to be ascertained on the accounting, and, if enough of them cannot be recalled to square the account, the organizers are jointly and severally liable for the deficiency.

For the reasons above given it seems clear beyond dispute that the complaint states with sufficient certainty a cause of action against Martin, Ballard, Adams, Magee and Lynch for an accounting of the proceeds of $650,000 bonds of Ferries and Cliff House Company, and as to this cause of action there is no defect or misjoinder of parties. All the parties against whom the accounting is sought are made defendants. The corporation is a necessary party, and Brown and Jarboe, if not strictly necessary parties, are certainly not improper parties to an action one object of which is to invalidate bonds of whose holders they are trustees. To this action for an accounting Powell Street Company and Park and Cliff House Company are not proper parties, and the demurrrer for defect of parties names no other defendant who should be joined. It goes partly upon the ground that the present holders of the stocks and bonds which it is sought to invalidate should be made parties, but the complaint shows that these holders, aside from the defendants, are unknown to plaintiff, and the demurrers do not disclose their names. Plaintiff asks leave and should be allowed to bring them in when they are disclosed.

The complaint states no case for a decree quieting title against anyone, and the prayer for that relief, and for all other relief not warranted by the facts alleged, should simply be disregarded. Such being the case, it was error in the superior court to sustain the demurrers generally. There were, as has been indicated, some specific grounds of demurrer that were well taken, and the order should have been limited to those grounds. So limited, it would not have justified the conclusion and judgment "that the plaintiff is not entitled to any relief against the defendants, or against any of them," etc. On the contrary, there would have remained a clear case for substantial relief; and, though the court might have been justified in requiring the plaintiff to strike out some of the redundant and irrelevant matters contained in the complaint before requiring the defendants to answer, it could not deny him any relief. Judgment reversed and cause remanded, with leave to the plaintiff to amend his complaint in accordance with the views herein expressed.

We concur: Henshaw, J.; Temple, J.